# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

AUSTIN D. MENSER,

        *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

CASE NO. 16-11787

DISTRICT JUDGE STEPHEN J. MURPHY, III

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 22)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Menser is not disabled. Accordingly, **IT IS RECOMMENDED** that Menser's Motion for Summary Judgment (Doc. 16) be **GRANTED**, that the Commissioner's Motion for Summary Judgment (Doc. 22) be **DENIED**, and that this case be **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g).**

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff's claim for child disability benefits ("CDB")[1] under 42 U.S.C. § 1382c(a)(3)(C) and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 4; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 22).

Plaintiff Austin Menser was twenty-five years old as of March 21, 2015, the date of the ALJ's decision. (Tr. 28, 182). The record contains disability determination transmittal forms produced in 2010, 2011, and 2012. (Tr. 69-102). However, the parties agree that the applications for benefits at issue in this civil action were initially denied on October 22, 2013. (Tr. 144-51; Doc. 16 at 2; Doc. 22 at 4). These prior applications appear to have been voluntarily dismissed in 2012. (Tr. 36-37). Menser requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Jacqueline Hall-Keith on February 26, 2015. (Tr. 33-68). Menser, represented by attorney Emily Walker, testified, as did vocational expert ("VE") Kelly Stroker. (*Id*.). On March 21, 2015, the ALJ issued a written decision in which she found Menser not disabled. (Tr. 20-28). On March 29, 2016, the Appeals Council denied review. (Tr. 1-4). Menser filed for judicial review of that final decision on May 19, 2015. (Doc. 1).

---

[1] CDB eligibility is evaluated using a unique set of criteria. *See* 42 U.S.C. § 1382c; 20 C.F.R. § 416.926a. Menser does not argue that the ALJ applied the wrong set of criteria to his CDB claim, and indeed it appears that Menser's CDB claim may have been dismissed. The Court does not further evaluate Menser's disability claim under the CDB standards.

## B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Menser not disabled under the Act. (Tr. 28). The ALJ found at Step One that Menser had not engaged in substantial gainful activity following the alleged onset date, September 1, 2007. (Tr. 22). At Step Two, the ALJ concluded that Menser had the following severe impairment: "ulcerative colitis." (*Id.*). At Step Three, the ALJ found that Menser's combination of impairments did not meet or equal one of the listed impairments. (*Id.*). The ALJ then found that Menser had the residual functional capacity ("RFC") to perform work at all exertional levels, except with nonexertional limitations as follows:

> [T]he ability to take bathroom breaks on average an extra five minutes per hour beyond typical breaks and lunch with the flexibility to take bathroom breaks as needed[2] and complete work at his own pace within an eight-hour workday and/or 40 hour workweek.

(Tr. 23-26). At Step Four, the ALJ found that Menser had no past relevant work. (Tr. 26-27). At Step Five, the ALJ concluded that Menser retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 27-28).

---

[2] While the ALJ purports to have based her decision on the testimony of the VE at the oral hearing, the hypothetical she asked of the VE differs from the RFC ultimately used in her decision. Specifically, the RFC in the decision includes a provision for "the flexibility to take bathroom breaks as needed and complete work at his own pace within an eight-hour workday and/or 40 hour workweek," while the ALJ's hypothetical does not. (Tr. 23, 62). Menser does not specifically argue that the ALJ's decision lacks substantial evidence because of the inconsistency between the hypothetical to the VE and the ultimate RFC. However, given that the Court recommends remand for other reasons, I suggest that (if Menser's claim is resubmitted to an ALJ) the ALJ should ensure compatibility between his or her questions to the VE and the RFC finding allegedly premised on that VE testimony.

### E. Administrative Record

#### 1. Medical Evidence

The Court has thoroughly reviewed Menser's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### a. Menser's Function Report

Menser completed a function report on October 25, 2010, in which he asserted that his ulcerative colitis forced him to "stay very close to a bathroom at all times." (Tr. 221). Once the urge to use the bathroom took effect, he had "around 5-10 seconds to make it to the bathroom." (*Id.*). The attacks happened "mostly at random and very often." (*Id.*). His days consisted of eating, taking medication, performing chores around the house, and using his computer, along with repeatedly using the bathroom. (Tr. 222). Menser and his father took care of a pet dog, including taking it for walks. (*Id.*). Menser's sleep was interrupted two to five times nightly by the urge to use the bathroom. (*Id.*). He had no difficulty performing personal care activities. (*Id.*).

Menser prepared meals on a daily basis; his ability to cook was not limited by his ailment. (Tr. 223). He had no difficulty performing chores around the house because had constant access to a bathroom there. (*Id.*). He went outside roughly every other day. (Tr. 224). He was able to drive a car. (*Id.*). He shopped in stores for groceries and household

needs a few times a week for roughly an hour per trip. (*Id*.). His hobbies once included playing numerous sports, but his colitis limited him to occasional exercise and video games. (Tr. 225). Menser spent time with friends, and communicated with others by phone and computer. (*Id*.). He alleged no exertional or mental limitations. (Tr. 226-27). Menser failed to complete a portion of the form addressing medications and medication side effects. (Tr. 228).

### b.     Menser's Testimony at the Administrative Hearing

At the February 26, 2015, hearing before the ALJ, Menser indicated that he would like to obtain a part-time job doing carpentry, but admitted that he did not have "too many plans" for the future. (Tr. 41). He last worked in 2015 as a part-time retail sales associate for about twenty hours per week, with some variance in his weekly hours. (Tr. 43-44). He assisted customers, restocked shelves, and worked the register. (Tr. 45).

Menser received an infusion every two months for treatment of his colitis, along with a daily over-the-counter anti-diarrheal, and an immunosuppressant medication. (Tr. 46). He alleged no exertional or postural limitations. (Tr. 46-47). He performed numerous household chores without limitation. (Tr. 48-49). When driving, Menser averred that he limited himself to locations within ten miles. (Tr. 47). Longer drives increased the risk of defecating in his pants; this occurred more frequently than he "care[d] to remember." (Tr. 55).

Menser maintained a nocturnal schedule, waking at five in the afternoon and returning to bed early in the morning hours. (Tr. 49). He did this to avoid interacting with his family, who caused "a lot of stress in [his] life." (Tr. 53). Avoiding this stress "most likely" helped Menser to "manager [his] symptoms slightly." (*Id*.). He obtained ten to eleven hours of sleep nightly, and obtaining less sleep caused a "flare up" of his colitis. (Tr. 53-54). Menser asserted that "flare ups" caused him to defecate "eight to ten times throughout the day having no warning signs to get to a bathroom and blood in the stools," along with "severe abdominal cramps" during the early days of the flare up. (Tr. 54). He suffered from flare ups for roughly eight years prior, *i.e.* since 2007. (*Id*.). They occurred roughly "every month or two," and lasting "one to two weeks on average." (Tr. 54-55). His bi-monthly immunosuppressant infusions caused a "mild flare up," which resulted in "one to two days of diarrhea," during which time he defecated approximately six times daily. (Tr. 55). Menser stated that his bathroom visits lasted between fifteen and thirty minutes. (*Id*.).

Menser asserted that he lost "40 pounds in three days" on one occasion in 2006 or 2007, which he was able to regain through the use of the anti-inflammatory Prednisone. (Tr. 58). He did not regularly use prednisone because he considered it a "very potent and dangerous drug," which can "lead to a lot of bad side effects." He reserved this drug for use while traveling or to reduce the effects of a flare up. (Tr. 58-59). Menser most recently

used the drug to travel to his friend's wedding in Kansas, which made the twelve hour trip "actually doable." (Tr. 59). Menser attested that he was asleep for "most of" the drive. (*Id*.).

Menser attested to using the bathroom "four or five times in the morning" between his other daily activities. (Tr. 49-50). He regularly used the computer for communicating, watching videos, and playing games. (Tr. 50-51). He played massively multiplayer online games for roughly eight hours daily. (Tr. 52). However, Menser testified that he took breaks "for food, going to the bathroom, exercise" throughout the day. (*Id*.).

Menser testified that he "had to drop out" of high school because his "colitis just got too bad." (Tr. 53). He suffered from "[d]iarrhea all the time," and "[m]any times could not make it to the bathroom." (*Id*.).

The ALJ asked whether Menser considered himself a "pretty reliable employee" while working in a retail sales position; Menser agreed that he was. (Tr. 55-56). When asked whether he "miss[ed] work," Menser asserted that he was not absent "anymore than [he] had to." (Tr. 56). However, he "had to [be absent] quite a few times when [he] had a flare up that was too severe to work through, or if [he] could [he] would switch [his] hours with someone else." (*Id*.). He estimated that he missed work at least three or four times per month. (*Id*.). Menser was regularly late for work because anxiety about driving would cause him to defecate, delaying his drive. (*Id*.). He described this as a "constant cycle" which resulted in tardiness no matter how early he attempted to leave. (Tr. 57). Menser was "late very often," and "should have been fired twice over," but his manager "lost the

sheet that showed how many tardies [he] had." (*Id*.). Menser estimated that he was late nineteen times during an unstated period of his employment as a retail sales associate. (*Id*.). Menser ultimately quit this position because his "flare up that [he] had at the time was too severe," which caused him to miss "weeks" of work. (*Id*.).

### c.     The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Menser's ability to perform work. (Tr. 60). The ALJ and VE concluded that Menser's past work was not performed at the level of substantial gainful employment. (Tr. 61).

The ALJ asked the VE to assume a hypothetical individual with Menser's age, education, and work experience, and who could perform work at all exertional levels, but who is further permitted to "take a bathroom break on average extra five minutes per hour beyond the typical breaks and lunch." (Tr. 62). The VE found that such a worker could perform work only as an office cleaner, of which there were about 120,000 positions nationally. (*Id*.). About half of those positions permitted night schedules. (*Id*.). The work was goal oriented (*i.e.* cleaning an office) rather than pace work. (Tr. 63). The VE confirmed that such work permitted "breaks as you need, pretty much."[3] (*Id*.).

The ALJ then asked whether there might be "home based jobs" that would fit the proposed hypothetical worker. (Tr. 63). The VE noted that a semiskilled position such a

---

[3] The VE later testified that an employee who took eight to ten bathroom breaks for thirty minutes each would not be employable. (Tr. 66). Her testimony that office cleaner work permitted breaks "as you need" should therefore not be interpreted to mean that office cleaner positions can be performed in conjunction with lengthy or numerous breaks.

telemarketer might fit the hypothetical. (*Id*.). There were about 100,000 such positions nationally. (*Id*.). The ALJ asked whether telemarketing jobs "would allow . . . flexibility to even sit in the bathroom if you wanted to using a laptop . . . as long as you wanted to sit." (*Id*.). Menser noted that customers would not "want to hear that," apparently referencing the unpleasant sounds produced during his diarrheal episodes. (Tr. 64). The ALJ vaguely responded that Menser was "not being controlled by the job itself if you're doing – you're inputting data or whatever . . . . So I guess what I'm trying to go to as I understood your testimony there may be a time when you get an urge, but you're not necessarily doing something, but you just, on the precaution that you might have to do something, you're sitting in the bathroom to wait to see what's going to happen." (*Id*.). The ALJ further stated "you said you were doing your game eight hours, so I'm presuming that at some point if you need to, you take the game with you to do whatever if you think you might have a need to do something. You're sitting there playing your game and you can talk at the same time, because otherwise I don't know how you'd do that at eight hours." (*Id*.). In an attempt to clarify the ALJ's perplexing suggestion, Menser noted that he does not "play the time while . . . on the bathroom. I just leave." (*Id*.). The ALJ then reconfirmed her confusion, stating "[b]ut you said eight hours, so I'm trying to get to how you can play the game for eight hours. That's really what I'm trying to get to." (*Id*.). Menser yet again reiterated that he simply "get[s] up and leave[s]" the game when necessary, leaving the game running, because it is "more important that [he] go to the bathroom than it is to play the game." (Tr.

65). The ALJ then asked whether Menser had to "start over again" or whether there was "a way to continue" the game. (*Id*.). Menser testified that he could leave the game running without issue. (Tr. 65-66). The ALJ asserted that a telemarketing position was quite similar to this sort of gaming, because workers are "given a list and you have these people that you must contact over an eight hour period or whatever and you do that, and they don't care how long it takes you." (Tr. 66).

Menser's attorney then asked the VE whether a worker who was "unable to get the tasks done in the allotted time" would be able to maintain work; the VE confirmed that such a worker would not be employable. (Tr. 66). The VE further confirmed that someone who found it necessary to use the bathroom "eight to ten times a day [for a] half an hour each" would be unable to maintain full time employment "even at these positions." (*Id*.). The ALJ challenged this conclusion, asserting that Menser could use the bathroom in his "down time" and perform work around his defecation schedule. (Tr. 67). The ALJ then asserted, in a manner totally inconsistent with her earlier assertion, that work as a home-based telemarketer would not require that the worker complete "a certain number" of calls . . . "so as long as you get the 40 hours worth of work done during the 40 hours, it doesn't matter whether you did it in two weeks[4], or you did it at the beginning of the week or you

---

[4] It is unclear what the ALJ could have meant by this remark. A worker who takes two weeks to complete forty hours (*i.e.* one week's worth) of work would doubtless be unemployable, as said worker would be working at half the expected pace. The ALJ also appears to characterize home-based telemarketing work as piece work (*i.e.* work judged by the amount of calls made), and as hour work (*i.e.* work which depends

do it at the end of the week." (*Id.*). The VE then made the self-evident point that workers must "get it done on a week basis, so you can't do two – a month of work in two weeks and then just not do the other two weeks because you're sick." (*Id.*). The ALJ suggested that there might be a "kind of job where they don't care" about how long the worker takes to complete work; the VE testified that she was not aware of any such job. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such

---

on the amount of time worked rather than the amount of tasks accomplished). This inconsistency should be reexamined on remand.

opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore,

the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Hammond v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding

a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Hammond v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a).

Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)   Treatment, other than medication, . . . received for relief of . . . pain;
(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

G.     **Analysis**

Menser argues that that the ALJ erred in the following ways: 1) Failing to consider his ability to complete work on a sustained basis; 2) Failing to grant controlling weight to the opinion of Dr. Bral; 3) Failing to determine whether the VE's testimony was consistent with the dictionary of occupational titles ("DOT"), in violation of SSR 00-4p. (Doc. 16 at 11-19). These arguments will be addressed in turn.

1.     **The ALJ Failed to Account for Menser's Inability to Work on a Sustained Basis**

Menser first argues that the ALJ erred by concluding that, despite his ulcerative colitis, he could perform work on an eight hour per day, forty hour per week, basis. The ALJ supported her argument with reference to a medical record that Menser's colitis "can be well-controlled," and was well-controlled in May 2008. (Tr. 24). Menser notes that the ALJ pointed to only a single medical record in support of this conclusion, and ignored his flare ups. (Doc. 16 at 12). The ALJ also found that Menser was "able to maintain a schedule and perform activities of daily living without difficulty" during the periods when he was "not suffering from a flare-up" (Tr. 25). Menser thus concludes that the ALJ based her RFC finding on his ability to work when he "*sometimes* experiences less symptoms," while improperly ignoring the wider picture of his health. (Doc. 16 at 12).The     Commissioner responds that the ALJ's decision is well-supported, in part because she cited evidence

demonstrating that Menser's colitis could be controlled with medication. (Doc. 22 at 6-8).

Undisputedly, Menser experienced flare ups on occasion which significantly exacerbated his colitis despite the use of preventative medication. An RFC must reflect the work claimants can do "despite his limitations," thus ALJ was obligated to consider Menser's flare ups as part of his overall health. *See* 20 C.F.R. § 404.1545(a)(2); *O'Neill v. Astrue*, 762 F. Supp. 2d 1158, 1177 (D. Minn. 2011) (concluding that "the ALJ erred by rejecting Plaintiff's complaints of needing to use the bathroom frequently because Plaintiff's Crohn's disease was stable" where the record demonstrated that the claimant's intestinal ailment was difficult to treat and occasionally flared). There is no evidence in the record from which the ALJ could conclude that Menser could totally prevent flare ups. The ALJ appears to have formulated the RFC in this case based on Menser's health "when the claimant is not suffering from a flare-up," because she concluded that during this non-flare period he was "able to maintain a schedule and perform activities of daily living without difficulty." (Tr. 25). Insofar as the ALJ wholly discounted Menser's testimony and the medical record to conclude that he did not experience flare ups at all, her decision is without support.

The more difficult question is whether Menser could, through the use of Prednisone, reduce the length, incidence, and impact of his flare ups to the point where he could complete work available in substantial numbers in the national economy. Neither party addresses how the Commissioner should evaluate a claimant who voluntarily chooses not

to treat their ailment to the fullest possible extent on account of side effects or risks posed by the treatment. It is generally true that a claimant who experiences disabling pain or symptoms can be expected to seek treatment. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). However, several courts have quite sensibly concluded that a claimant cannot be faulted for refusing to take medication on account of side effects "*without further addressing the claimant's stated concern*." *Pouyadou v. Colvin*, No. CIV.A. 13-00171-N, 2013 WL 5934495, at *6 (S.D. Ala. Nov. 5, 2013); *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment."); *Fobian v. Astrue*, No. ED CV 08-567 PJW, 2009 WL 3416219, at *3 (C.D. Cal. Oct. 18, 2009) ("The ALJ also relied on the fact that Plaintiff was not using strong pain relievers to treat his symptoms to conclude that he was not truthful. This is a valid reason to discredit a claimant's testimony, but the ALJ overlooked Plaintiff's explanation as to why he did not use more powerful medicine, *i.e.*, because it was addictive and had the potential to harm his liver, which was already at risk from hepatitis . . . . This was error.").

The ALJ's failure to engage with Menser's alleged medication side effects is particularly troubling in this case, because it is not even clear what those side effects were. While Menser noted the existence of side effects at the hearing before the ALJ, the ALJ

did not deign to further inquire as to the nature or severity of these side effects. (Tr. 58-59). In her decision, the ALJ appears to treat Prednisone as a panacea for Menser's ills, asserting that "the claimant is able to better control his symptoms using medication, but chooses not to do so. Such information tends to suggest that the claimant's inability to work may be more of a personal choice to motivate rather than an inability to control his symptoms." (Tr. 25). The ALJ thus appears to conclude, without evidence and contrary to Menser's testimony, that Prednisone would not cause side effects significant enough to merit inclusion in the RFC.

Furthermore, the ALJ's finding that Prednisone did not cause any noteworthy side effects comes dangerously close to "playing doctor," *i.e.* rendering a finding which treads on the exclusive province of doctors. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 194 (6th Cir. 2009) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Numerous courts have cited medical evidence suggesting that Prednisone has serious side effects, including fatigue, sleepiness, muscle weakness, mood disorders, diabetes, and risk of infection. *See Jarrett v. Colvin*, No. 3:12-CV-4044-BH, 2014 WL 1281293, at *13 (N.D. Tex. Mar. 31, 2014) (remanding where the ALJ failed to consider the side effects of Prednisone); *Gholston v. Comm'r of Soc. Sec.*, No. 07-CV-14902, 2009 WL 440956, at *10 (E.D. Mich. Feb. 23, 2009) (same); *Cowley v. Abbott Labs., Inc.*, 476 F. Supp. 2d 1053, 1054 (W.D. Wis. 2007) ("Prednisone carries a high risk

of side-effects such as weight gain, diabetes, coronary disease, cataracts, glaucoma, thinning of the skin, and infections."). The ALJ's decision to discount Menser's credibility on the basis of his choice to limit his intake of Prednisone, particularly without engaging with Menser's reasoning for that choice, is not well supported.

The ALJ likewise concludes that Menser's twelve-hour road trip to Kansas to attend a friend's wedding was inconsistent with his asserted degree of disability. (Tr. 25). Menser testified that he used Prednisone during that trip, and that the use of that powerful anti-inflammatory made "the trip actually doable." (Tr. 58-59). As a result, the strength of the ALJ's reasoning here depends on whether Menser could use Prednisone on a more regular basis to control his colitis symptoms. As addressed above, the ALJ insufficiently supported her argument that Menser is blameworthy for not taking Prednisone regularly, because she wholly failed to address the side effects and long term cost of that medication. Menser's lengthy trip to Kansas thus does little to undermine his testimony regarding his day-to-day symptoms.

The ALJ also supported her decision with reference to Menser's ability to sit through the hour-long oral hearing without requiring a bathroom break, despite hearings being "normally stressful for most people." (Tr. 25). This justification provides, at best, weak support for the ALJ's decision. The ALJ did not deign to actually inquire whether Menser felt stressed during the hearing, and thus can only guess as to Menser's stress level at the hearing. Menser also candidly testified that he is able to shop in stores for up to an

hour, suggesting that his ability to sit through the hearing does not discredit his testimony regarding the frequency of his bathroom trips. (Tr. 224).

Menser also argues that the ALJ improperly relied on his ability to play games for eight hours daily as support for his ability to work, because Menser explicitly stated that he could access the bathroom at will when gaming. (Doc. 16 at 13). The ALJ held that "[a]lthough the claimant noted that while doing these activities he is able to use the bathroom as needed, the fact remains that he is able to perform activities on a sustained basis despite his allegations." (Tr. 25). This flawed reasoning provides no support whatsoever. The crux of Menser's claim is that he cannot work on a full time basis because of the need for regular, lengthy bathroom breaks. Menser explicitly attested, as the ALJ herself recognizes, that he regularly interrupts his gaming sessions to defecate as necessary. (Tr. 65). The ALJ's point appears to be that Menser can sustain attention on an activity for eight hour stretches, with regular bathroom breaks. If Menser alleged disability by way of limitations to his concentration, persistence, or pace, this conclusion would be logical and relevant. Where Menser alleges disability solely by reason of his ulcerative colitis, his ability to focus on a task (as interrupted by bathroom breaks) says nothing about his degree of disability.

The ALJ also attempted to analogize Menser's gaming time to home-based work as a telemarketer. The ALJ asked whether such jobs had the "flexibility to even sit in the bathroom if you wanted to using a laptop," apparently suggesting that telemarketing jobs

could be performed in between rounds of defecation. (Tr. 63). Menser quite sensibly suggested that customers would not wish to hear the vulgar sounds produced as the result of his colitis. (*Id.*). Whether or not the ALJ intended it as such, this remark stands out as particularly undignified.[5] The Commissioner has opted to not defend the ALJ's findings as regards telemarketing positions. At the risk of causing further harm by engaging with the ALJ's inappropriate line of inquiry, the undersigned notes that Menser attested that his colitis sometimes causes him to defecate with only a few seconds of notice, as exemplified by his testimony that he has defecated in his pants on several occasions. (Tr. 55, 221). The ALJ did not ask the VE whether a worker could perform a job telephonically from home despite the occurrence of sudden bouts of defecation. In response to Menser's attorney's questioning, the VE noted that a worker who defecated eight to ten times daily for thirty minutes per session would be unemployable. (Tr. 66). The ALJ also concluded that Menser's alleged need to take fifteen to thirty minute bathroom breaks was not credible. (Tr. 25). However, instead of seeking evidentiary support via a qualified medical expert or by relying on Plaintiff's testimony, the ALJ opted to make her own determination that Menser would need only five minutes per bathroom break to defecate. Determining how

---

[5] Menser does not argue that the ALJ's comments were so biased as to demonstrate partiality, and does not move for a hearing before another ALJ. The Sixth Circuit has held that even "demeaning and discourteous" comments fall short of demonstrating an ALJ's bias. *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 364 (6th Cir. 2004). The undersigned likewise does not specifically recommend that the Commissioner be ordered to hold a second hearing before a different ALJ. Nevertheless, the undersigned makes special note of the ALJ's remarks so that they may be considered by the Commissioner on remand. Social Security benefits claimants are entitled to a modicum of dignity.

long Menser requires for bathroom breaks is a medical issue beyond the ken of ALJs; the ALJ once again succumbed to the temptation to play doctor.

The ALJ also supported her decision by reference to Menser's work in retail. (Tr. 25). This line of reasoning provides some support for the ALJ's decision, but it is insufficient to rescue this deeply flawed decision. The ALJ noted that Menser worked from August 2012 through November 2013, working roughly twenty hours per week, and had "relatively consistent hours over the course of several months," including working "between 14 at 33 hours each week" in November 2011. (Tr. 24-25). The ALJ reasons that, if Menser's symptoms were as severe and variable as he alleges, one would expect that his work hours would likewise "vary significantly . . . but they do not." (Tr. 25-26). However, Menser attested that he would swap hours with co-workers when possible, rendering his schedule more compatible with his flare ups, (Tr. 56), and he admitted that he was regularly tardy for work because of his condition, and probably should have been fired long before he quit retail sales work. (Tr. 57). These types of accommodations were not added in the ALJ's hypothetical to the VE and would undermine reliance on the hypothetical.

While the ALJ attempts to paint Menser's statement that he was a "reliable employee" yet missed plenty of work as inconsistent (Tr. 26), the transcript of the oral hearing reveals that Menser considered himself a reliable employee because he did not miss any more work than was necessitated by his colitis (Tr. 56). No inconsistency can be found here.

Accordingly, I find that the ALJ's conclusion that Mesner could perform work on a sustained basis is not supported by substantial evidence.

### 2. The ALJ Gave Appropriate Weight to Dr. Bral's Opinion

Menser next argues that the ALJ erred by giving too little weight to the opinion of Dr. Bral, Menser's treating physician who has treated him over many years for colitis. (Doc. 16 at 14-17). The ALJ concluded that Dr. Bral's opinion was inconsistent with other evidence of record and internally inconsistent. (Tr. 26). Menser argues that essentially all of his medical records relating to colitis were produced by Dr. Bral, therefore Dr. Bral's opinion cannot be inconsistent with other evidence of record. (Doc. 16 at 15). Yet Menser admits that his self-asserted degree of limitation was less than that assessed by Dr. Bral. (*Id.*). For instance, while Menser averred that he had no limitations to his ability to walk, sit, stand, or lift, Dr. Bral assessed significant restrictions in each of those areas. (Tr. 226, 256, 310, 663-64). Menser argues that these inconsistencies are a side issue, and that the main focus should be on the bathroom breaks he requires. (Doc. 16 at 15-16). More particularly, he notes that there is overlap between his own estimate for the length of bathroom breaks (fifteen to thirty minutes), and the length assessed by Dr. Bral (thirty to forty-five minutes), thus any inconsistency is irrelevant. (*Id.* at 16). The ALJ was correct on this point; it is entirely permissible to discount the value of a physician's opinion where that doctor estimates greater restrictions than asserted by the claimant himself. *See West v. Com'r Soc. Sec. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007); *Wright v. Sullivan*, No.

91–5992, 1992 WL 75218, at *5 (6th Cir. April 15, 1992). This is doubly true where the physician assesses restrictions inconsistent not just in intensity, but in kind. Dr. Bral's suggestion that Menser required sitting and standing limitations has no basis in the record, thus the persuasive value of his opinion is degraded as a whole. Therefore, this issue, standing alone, would not require remand.

### 3.     The ALJ's SSR 00-4p Error Was Harmless

Finally, Menser argues that the ALJ violated SSR 00-4p. (Doc. 16 at 18-19). SSR 00-4p provides that the ALJ must "inquire, on the record, as to whether or not [the VE's testimony is consistent with the DOT]." 2000 WL 1898704 at *2. The Commissioner properly admits that the ALJ did not ask whether the VE's testimony was consistent with the DOT, and that this was error. (Doc. 22 at 15-16). Menser argues that this error necessitates remand, because "the DOT does not account for home-based employment such as that envisioned by the ALJ during the VE's testimony." (Doc. 16 at 18). The Commissioner argues that the error was harmless because the VE identified work as an office cleaner, which is provided for in the DOT, and because that job alone satisfies the Commissioner's burden at Step Five. (Doc. 22 at 16-18).

An ALJ's failure to abide by SSR 00-4p can be either harmless or harmful; only in the latter case is remand appropriate. *See Fleeks v. Comm'r of Soc. Sec.*, No. 08-CV-13135, 2009 WL 2143768, at *6 (E.D. Mich. July 13, 2009). While Menser has identified a conflict between the DOT and the VE's testimony here as regards home-based work, he has not

alleged that there is any inconsistency between the DOT and the VE's testimony regarding the office cleaner position. The VE concluded that there were 120,000 office cleaner jobs available nationally, with half of those positions being available for night work. (Tr. 62). This number of jobs is sufficient to constitute a "significant number" for purposes of satisfying the Commissioner's burden at Step Five. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (surveying case law and holding that 6,000 jobs "fit[] comfortably within" the range of significant numbers of work). Menser has not identified remandable error on this point.

### H.  Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Menser's Motion for Summary Judgment (Doc. 16) be **GRANTED**, that the Commissioner's Motion for Summary Judgment (Doc. 22) be **DENIED**, and that this case be **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g).**

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct.

466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Menser v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 19, 2017

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 19, 2017                                   By s/Kristen Castaneda
                                                     Case Manager